UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:09-CV-151

KEITH RYBINSKI AND
ROBERT MCDANIEL                                                                PLAINTIFFS

V.

STATE FARM FIRE AND CASUALTY
COMPANY                                                                         DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court upon Defendant State Farm Fire and Casualty Company's Motion for Summary Judgment (DN 35). Plaintiffs have responded (DN 37). Defendant has replied (DN 38) and filed a supplemental memorandum in support of its motion (DN 41). This matter is now ripe for adjudication. For the following reasons, Defendant's motion for summary judgment is GRANTED.

## BACKGROUND

This action arises out of a October 15, 2008 fire loss to the McCracken County home of the plaintiffs, Keith Rybinski ("Rybinski") and Robert McDaniel ("McDaniel"). Rybinski owned the home and maintained a homeowners insurance policy with Defendant State Farm. McDaniel was a tenant in the home and maintained a separate renters insurance policy with Defendant State Farm. These policies were obtained in October 2007. Generally, the homeowners policy provided coverage for the dwelling, personal property, and additional living expenses. The renters policy provided coverage for personal property and additional living expenses.

The fire at Plaintiffs' home occurred in the morning of October 15, 2008, after McDaniel's daughter left for school and Plaintiffs left the house to run errands. After Rybinski dropped off McDaniel at a Department of Veteran Affairs meeting hall, McDaniel received a call

from a neighbor, who advised him that his home was on fire. McDaniel then contacted Rybinksi, who returned to pick up McDaniel. When Plaintiffs arrived back at their home, the fire department was attempting to suppress the fire. The home was a total loss.[1]

The day after the fire, Plaintiffs reported the loss to their State Farm agent, Sherri Morrill. State Farm assigned Rybinski's homeowners claims to Claim Representative Nancy Mitchell. Rybsinski and Mitchell met on October 16, 2008. At that time, Mitchell gave Rybinski a $1,000 advance towards his personal property, gave him Personal Property Inventory ("PPI") forms and a large loss letter, and spoke with him about the available coverages under the policy. Mitchell, in her affidavit, stated that she performed an inspection of the dwelling and fire loss scene and noted the need for a cause and origin investigation.

State Farm assigned McDaniel's renters claims to Claim Representative Merle Gambrill. Gambrill met with McDaniel on October 16, 2008. At that time, Gambrill interviewed McDaniel about the fire, explained the available coverages under the renters policy, and gave McDaniel a $1,000 advance towards his personal property. Gambrill, in his affidavit, also stated that McDaniel told him of the current renovations to the home and told him about some of the personal property in the dwelling.

The cause and origin investigation was performed by EFI Global on October 17, 2008, two days after the fire. State Farm contends the investigation revealed that Plaintiffs left a halogen work lamp in the crawl space under the floor where Plaintiffs were performing repairs due to termite damage and settlement. In his affidavit, Gambrill stated that McDaniel admitted

---

[1] For two nights, the Red Cross arranged for Plaintiffs to stay at a hotel in Lone Oak and provided food vouchers. Thereafter, Plaintiffs spoke to their claim representatives about living expenses to be paid under the policy, and moved to another hotel for a little over a month. Plaintiffs then moved to a two-bedroom apartment, where they stayed until they purchased and moved into a new modular dwelling on the site in October or November of 2009. State Farm continued to pay additional living expenses until being advised that Plaintiffs moved out of the apartment in March 2009.

to leaving a halogen lamp on when working in the crawl space the day before.  Additionally, the EFI report identified two halogen work lights, both plugged into extension cords, present in the crawl space.[2]  These cords and work lights showed extensive damage from the fire.  The EFI investigator further discovered that the extension cords were plugged into a power strip, with the switch in the "on" position.  The report also noted that McDaniel stated "they had several work lights down there which they plugged into extension cords and then into an outlet on the kitchen wall above the access door to the crawl space" and that "they also used a power strip in the kitchen."  McDaniel further informed the investigator that "[t]hey finished work the afternoon before the fire, but can't say for sure whether or not they turned off the lights in the crawl space," and "wondered if they might have been burning all night."  DN 38-1 at p. 5.  The report concluded:

> Fire pattern analysis indicates that the fire originated in the crawl space near the hole cut in the floor at the west end of the closet.  The lack of other heat sources indicates that ignition was most likely due to the extreme heat produced by the two halogen lamps which were left on in the crawl space.  Evidence indicates that the first fuel ignited consisted of the wooden floor joists already weakened by termite damage.  Circumstances bringing ignition and fuel together include a combustible too close too [sic] a heat source left unattended.

DN 38-1 at p. 5-6.  However, Plaintiffs maintain that there were never any halogen lights under the floor[3] and that "the local fire chief determined that the fire's origin was an electrical short."[4]  DN 37-1 at p. 4.

---

[2] The report also included photographs of the crawl space, with the halogen lights clearly shown on the ground.  DN 38-3, Photographs 48 and 55.

[3] Plaintiffs further contend that, if there had been a halogen lamp, then the floor where the fire was started would have been destroyed.   Instead, the Plaintiffs contend that the floor directly below where the halogen lamps were allegedly place was fully intact and contained not the slightest evidence of fire.  However, Plaintiffs have presented no evidence to substantiate this assertion or to contradict the investigative report.

State Farm maintains that, because of the presence of several National Insurance Crime Bureau ("NICB") indicators, it referred part of the investigation to its Special Investigative Unit (SIU). These indicators included the policies being in effect for less than one year and the plaintiffs being absent from the dwelling at the time of the fire. SIU Claim Representative Debra Massie was then assigned the investigation. In her affidavit, Massie stated that her initial investigation revealed potential inconsistencies in the timeline reported by Plaintiffs and the initial reports regarding the stage of the fire upon its discovery. Additionally, Massie stated that the dwelling's extensive construction issues and termite damage, as well as the nature of the fire resulting from a halogen lamp coming into contact with combustible materials, warranted further investigation.

On October 29, 2008, Massie met with Plaintiffs to discuss SIU's involvement in the matter. According to Massie, she also explained applicable coverages under the policies and additional living expenses. She also provided Plaintiffs with a duties and proof of loss letter. At this meeting, McDaniel submitted his completed PPI forms amounting to $35,787.00, based in large part on his and his daughter's review of old pictures, an internet search, and their recollections. McDaniel also submitted a sworn statement of loss, claiming $41,787.96 as the replacement value of his personal property, which he calculated as the $35,787 actual cash value plus 20%.

On November 13, 2008, Massie spoke with Plaintiffs about taking their recorded statements. Rybinski contends that, at some point during the investigation, Massie told him that he "fit a profile." Rybinski states that, because of this statement, Plaintiffs retained Mr. Megibow as counsel. However, Rybinski also admitted that at no point did State Farm accuse

---

[4] Again, Plaintiffs have offered no evidence to support their assertion that the fire's origin was an electrical short. The Dispatched Incident Report from the Hedron Fire Department stated that the source of ignition was "Undetermined." DN 38-4.

him or McDaniel of arson.  On November 18, 2008, Plaintiffs advised State Farm that they had retained counsel.  From that point on, all communications with State Farm were directed through their attorney.  Plaintiffs submitted all receipts for personal property they replaced to Mr. Megibow in order to receive reimbursement for the replacement costs.  Rybinski admittedly did not know how quickly Mr. Megibow forwarded those receipts to State Farm.

On December 9, 2008, Plaintiffs provided their recorded statements to Massie.  Prior to this meeting, Massie requested that a claims processor review McDaniel's PPI forms.  At the December 9 meeting, Massie discussed with Plaintiffs the information they had submitted, the circumstances of the fire, and other information to corroborate and document Plaintiffs claims.

The day after that meeting, on December 10, 2008, Rybinski submitted his completed PPI forms and a sworn statement of loss, requesting $170,367.00 for the damaged dwelling, $60,386.00 for the damaged personal property, and $1,459.29 for additional living expenses.  Massie then contacted Mr. Megibow to request an opportunity to re-inspect Rybinski's contents because certain items lacked proper description or documentation of age.  Massie further stated that there were possible inconsistencies between the items listed in Rybinski's PPI forms and as discovered in her investigation.  Massie then re-inspected the dwelling on January 13, 2009 and took McDaniel's supplemental recorded statement on January 23, 2009 at Mr. Megibow's office.

On February 13, 2009, Massie informed Mr. Megibow that State Farm was reviewing Plaintiffs' PPI forms and their recorded statements and would contact him soon to discuss State Farm's findings.  In a faxed letter also dated February 13, 2009, Mr. Megibow stated that "My clients and I more than understand any delay in getting to his claim.  The weather has everybody

set back a couple of weeks."[5]  DN 35-19.  Along with the letter, Mr. Megibow submitted additional PPI worksheets and an estimate for excavation of the home and debris removal.

State Farm resolved all questions of coverage in favor of Plaintiffs.  Massie explained that her investigation verified the items claimed in Plaintiffs' PPI forms and their corresponding values, and uncovered no evidence that the fire was intentionally set.  By letter dated February 19, 2009, Massie confirmed that State Farm resolved all doubts in favor of the insured, and enclosed a check in the amount of $9,200.12 for McDaniel's personal property claim.  This amount reflected State Farm's calculation of the replacement cost of the items, less depreciation.  State Farm uses a Contents Inventory program to calculate depreciation based on the category of the item, the age of the item, and application of a useful like of the item.  Massie further advised McDaniel of the availability of replacement costs benefits should he replace the items.  McDaniel testified that he understood that he could submit the receipts for the replaced items and State Farm would then pay him the difference.

In a letter dated March 10, 2009, Massie confirmed that State Farm had resolved all doubts in favor of Rybinski, and enclosed a check for $90,495.33 for the actual cash value of the home per State Farm's estimate, and a check for $18,444.99 for the personal property claim per State Farm's calculation of the replacement cost less depreciation.  To calculate the actual cash value of the home, State Farm used a software program called Xactimate, which takes into account the square footage of the home, types and numbers of rooms, the home's construction materials, and local material and labor rates.  The Xactimate program also utilizes depreciation based on the age of the home.  State Farm added further depreciation based on the termite damage and other repairs needed for the home.  Rybinski testified in his deposition that he

---

[5] Mr. Megibow was presumably referring to the 2009 ice storm.

understood that once he purchased a new home, State Farm would pay him the replacement cost benefits up to the estimated replacement cost.  With regards to Rybinski's personal property, the March 10 letter explained that State Farm had made changes to the values and ages of several items in the PPI forms based on the additional recorded statement, inspection of the items at the scene, and research regarding the most accurate replacement costs for the items.  Further, Massie asked Rybinski to review the enclosed Contents Inventory summary, advise her of any discrepancies, and provide evidence to support any request for changes the values listed in the summary.  There is no indication that Rybinski advised Massie of any discrepancies.

Plaintiffs entered into a contract with Countrywide Mobile Homes to purchase a new modular home on June 3, 2009.  After signing the contract, Rybinski forwarded it to Mr. Megibow with the understanding that he would forward it to State Farm.  However, State Farm contends that it first learned of the arranged purchase on July 16, 2009, when Mitchell received a call from a Countrywide Homes representative inquiring about a replacement cost payment for the purchase of Rybinski's new modular home.  Mr. Megibow then faxed a copy of the contract to Mitchell.

After Mitchell obtained authority to pay replacement cost benefits on the home, she then issued a draft to Rybinski and Countrywide Home Loans for $68,903.07 on August 3, 2009. Rybinski called State Farm that day to request that the draft be made out only to him, as he had previously paid off the mortgage.  Mitchell then advised Rybinski that she needed documentation to do so, because Countrywide was still listed as an additional named insured on the policy.  The next day Rybinski faxed a Release of Mortgage to Mitchell, who confirmed with the McCracken County Clerk's Office that there was no lien on the property.  Mitchell then voided the first draft, and issued a new draft payable only to Rybinski on August 5, 2009.  Rybinski used this payment

as a down payment on his modular home with the remaining amount towards the construction of the dwelling.

Due to various delays, Plaintiffs were not able to move into their new modular home until October 2009.  During the time between closing and moving in to the home, Plaintiffs submitted various receipts and invoices to Mr. Megibow with the understanding that he would forward them to State Farm for reimbursement.  In her affidavit, Mitchell stated that she never received any receipts or records indicating that Rybsinki replaced his personal property.

Plaintiffs then filed this bad faith action in McCracken Circuit Court on July 29, 2009, and State Farm removed the action to this Court.  In their complaint, Plaintiffs allege that State Farm violated Kentucky's Unfair Claims Settlement Practices Act, KRS 304.12-230(1)–(8) and (12)–(14), by failing to pay a claim that it knew was due and by delaying payment on a claim under the pretext of an assertion of arson.  As a result of State Farm's failure to pay their claims, Plaintiffs contend they were forced to retain counsel.  Plaintiffs also contend that State Farm "failed to pay for the re-building of the plaintiff's home under the guise of only approving a new building plan, which would cause the plaintiff to exceed the cost of a house that was within the budget of the amount of a house insured."  DN 1-2 at ¶ 9.  Plaintiffs further contend that they are entitled to punitive damages due to State Farm's outrageous conduct.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## ANALYSIS

### 1. Bad Faith Claims

The gravamen of Plaintiffs' Complaint is that State Farm violated the Unfair Claims Settlement Practices Act, or acted in bad faith, because State Farm unreasonably delayed payment and failed to make adequate payments pursuant to their respective policies. In its motion for summary judgment, State Farm contends that Plaintiffs' claims should be dismissed because Plaintiffs cannot establish the elements of bad faith under Kentucky law.

### a. Bad Faith Standard Under Kentucky Law

Although bad faith actions may be pursued under both the state's common law and the Unfair Claims Settlement Practices Act (UCSPA), KRS 304,12-230, "Kentucky adheres to a single test applicable to all bad faith actions . . . whether premised upon common law or a statutory violation." *Cobb King v. Liberty Mut. Inc. Co.*, 54 F. App'x 833, 835 (6th Cir. 2003) (internal quotations omitted). Thus, "the claims under the UCSPA and common law bad faith claims [may be] analyzed together."[6] *Id*.

---

[6] Under this statutory section, an insurer may engage in unfair claims settlement practice if the following occurs:

> (1) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
>
> (2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
>
> (3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
>
> (4) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
>
> (5) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
>
> (6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
>
> (7) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;
>
> (8) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;
> . . .
> (12) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then

The Kentucky Supreme Court has set forth the following test to review claims of bad faith:

> [A]n insured must prove three elements in order to prevail against an insurance company for alleged refusal in bad faith to pay the insured's claim: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (quoting *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 178 (Ky. 1989) (dissent Leibson, J.)); *see Cowan v. Paul Revere Life Ins. Co.*, 30 F. App'x 384, 387 (6th Cir. 2002) (unpublished) (applying Kentucky law).  A claim of bad faith is only cognizable if the evidence is adequate to warrant punitive damages.  *United Services Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) (citation omitted).  This entails that "the proof is sufficient for the jury to conclude that there was conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Wittmer*, 864 S.W.2d at 890 (citations and quotation marks omitted).  "Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury."  *United Services*, 183 S.W.3d at 186.

### b. Kentucky's Bad Faith Law as Applied to Facts

---

requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

(13) Failing to promptly settle claims, where liability has become reasonable clear, under one (1) portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

(14) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement[.]

KRS § 304.12-230(1)-(14).  Plaintiffs claim violations of each of these provisions in their complaint. DN 1-2.

The crux of State Farm's argument in support of its motion for summary judgment is that Plaintiffs cannot establish the second or third prongs of the *Wittmer* test.  In their Complaint and in their response to State Farm's motion, Plaintiffs generally argue that State Farm lacked a reasonable basis for denying payment of their claims,[7] and that its failure to pay the claims in a timely fashion was based on a "deliberate disregard of the truth."  Plaintiffs further contend that the only logical conclusion is that the investigator's actions were intended to extort a more favorable settlement or to deceive the insureds with respect to the applicable coverage amounts.  Finally, Plaintiffs conclude that State Farm's evil motive or reckless disregard can be inferred from the frivolous basis used to initially deny the claim.

In support of their position, Plaintiffs complain that State Farm failed to conduct a reasonable investigation and failed to request that an independent individual such as the State Fire Marshal conduct an investigation.  Plaintiffs deny that the fire was started by halogen lamps, and further assert that the local fire chief determined that the fire's origin was an electrical short.  Although Plaintiffs have offered no evidence to support these assertions, they maintain that there is a genuine issue of material fact as to where the fire started.  However, the foremost problem with this argument is that the origin of the fire is not a *material* fact in this case.  State Farm did not deny, or attempt to deny, Plaintiffs' claim based upon their determination that the fire was started by the halogen lamps in the crawl space.  Instead, the Court will construe Plaintiffs' principal argument to be that State Farm unreasonably referred its case to the SIU based on the presence of certain NICB indicators and the conclusion that Plaintiffs "fit the profile," thereby unreasonably delaying payment of their claims.

---

[7] Although Plaintiffs generally aver that State Farm denied their claim, there is no evidence to support of this assertion.  Plaintiffs have not described any claim that was denied, and have not submitted any evidence of claims that were submitted and not paid.

Based on the evidence submitted by the parties, the Court thinks that it is fair to conclude there were no obvious signs that the fire was intentionally set. However, State Farm contends it was entitled to determine whether the fire was a covered accidental loss, and that the referral to the SIU was warranted based on the following facts: (1) the policies were in effect less than a year, (2) Plaintiffs were absent from the dwelling at the time of fire, (3) no forced entry into the home, (4) evidence that the fire was started by halogen lights being left in the crawl space, (5) the need to complete extensive repairs to the home, (6) potential inconsistencies in the timelines regarding the date of loss, (7) and potential inconsistencies between personal property claimed and items discovered at the fire scene and supported by documentation and financial ability to purchase. In response, Plaintiffs contend that their claims were not "fairly debatable" and highlight the fact that they had not taken any pieces of personal property and placed them in a storage facility prior to the fire.

"It is certainly not bad faith an insurance company to undertake a full investigation, even if it believes it knows the facts." *Baymon v. State Farm Ins. Co*., 257 Fed. Appx. 858, 863 (6th Cir. 2007) (applying Kentucky law). Based upon the factors listed above, there was a reasonable basis for concluding that more than a cursory investigation was needed before approving and paying Plaintiffs' claims. Even if Massie told Rybinski that he "fit a profile," this is not sufficient to prove State Farm accused Plaintiffs of arson or to prove the investigation was unreasonable. Further, Plaintiffs have presented no evidence to show that the investigation was undertaken due to any evil motive on the part of State Farm. There is no evidence in the record that State Farm ever took the position that Plaintiffs intentionally set the fire, or ever denied coverage. Accordingly, there is nothing about State Farm's investigation or the actions of Massie that tends to prove an evil motive or reckless indifference for Plaintiffs' rights. That

Plaintiffs were offended by Massie's statement and investigation is not sufficient to establish a bad faith claim. Thus, State Farm did not act in bad faith in investigating Plaintiffs' claims.

Next the Court will address Plaintiffs' assertions that the payments made by State Farm were somehow evidence of bad faith.[8] With respect to this argument, Plaintiffs seem to take issue with State Farm's failure to immediately pay replacement cost benefits and failure to pay those replacement cost benefits upon the submission of receipts. Plaintiffs' claims can be divided into three groups: the real property claim, the personal property claims, and the living expenses claims.

As to the real property claim, Rybinksi's homeowners policy with State Farm states in relevant part:

1. A1 – Replacement Cost Loss Settlement – Similar Construction

a. We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered . . . subject to the following:

   (1) **until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss** of the damaged part of the property . . .

   (2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property . . .

   (3) to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed …

DN 35-3, at p. 11 (emphasis added).

---

[8] Although Plaintiffs do not directly argue in their response to Defendant's motion for summary judgment that the payments were inadequate, Plaintiffs have maintained throughout this action that State Farm failed to make adequate payments.

Rybinski submitted his Sworn Statement in Proof of Loss under his homeowners policy on December 10, 2008. DN 35-18. In this Proof of Loss, he requested $170,367 for the damaged building. On February 13, 2009, after a delay caused by the ice storm, Massie contacted Mr. Megibow to inform him of the status of Plaintiffs' claims. In response, Mr. Megibow sent revised PPI forms to State Farm. On March 10, 2009, State Farm concluded its investigation with regard to the home, found that the replacement cost of the home was $160,400.30, and tendered a check for $90,496.33, which represented the actual cash value of the home. When State Farm learned of Rybinski's contract on his new modular home, State Farm promptly tendered the remaining replacement cost benefits in conformity with the homeowners policy. Rybinski did not dispute the valuation of his home by invoking the available appraisal provision of his homeowners policy. Pursuant to the terms of the homeowners policy, Rybinski was not entitled to the full replacement cost of his home until he submitted proof to State Farm that he replaced his home. Thus, there is no evidence that State Farm in any way denied coverage under the terms of the homeowners policy.

With respect to Plaintiffs' personal property claims, there is no evidence in the record from which a jury could conclude that State Farm denied Plaintiffs' claims or failed to make adequate payments on Plaintiffs' claims. Rybinski's homeowners policy and McDaniel's renters policy both provided that State Farm would pay personal property claims by first paying the item's replacement cost less depreciation, and then the remainder of the replacement cost benefits when the item was actually replaced. DN 35-3 at p. 12; DN 35-5 at p. 10. Plaintiffs have not described or presented evidence of any claims which were submitted and then never paid. Instead Plaintiffs complain only that "'[t]hree years after the fire [ ] claims are still being paid." DN 37-1 at p. 10. Thus, by Plaintiffs own admission, State Farm has paid the claims their

attorney submitted. Likewise, there is no evidence that State Farm did not pay Plaintiffs' claims for additional living expenses.

Furthermore, the investigation and subsequent payment of Plaintiffs' claims did not take a unreasonably long time. Massie recommended that State Farm resolve all doubts in favor of extending coverage as early as February 19, 2009, approximately four months after the fire occurred. However, Massie did not finish taking Plaintiffs' recorded statements until January 23, 2009. With regard to the promptness of settlements, "mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or deception." *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452 (Ky. 1997). "There must be proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Id*. "Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith. Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown." *United Services*, 183 S.W.3d at 186.

Here, there is no evidence of any affirmative act of harassment or deception on the part of State Farm. Nor is there any evidence from which it can be inferred that State Farm delayed paying Plaintiffs' claims in order to extort a more favorable settlement or to deceive the insured. Instead, State Farm explained the available coverages to Plaintiffs several times, immediately advanced $1,000 to each plaintiff, and continued to pay Plaintiffs' living expenses. Finally, the Court notes that, even if mere delay in payment of claims were sufficient to establish bad faith, Plaintiffs have not submitted any evidence from which the Court could conclude that State Farm "agonizingly paid plaintiffs living expenses" or other claims.

In conclusion, there is no evidence that State Farm either unreasonably denied or delayed coverage or acted with an evil motive or reckless indifference to the rights of others. "Courts have been clear that 'in order to survive a motion for summary judgment, a plaintiff in a bad faith action must come forward with evidence, sufficient to defeat a directed verdict at trial, which reveals some act of conscious wrongdoing or recklessness on the part of the insurer.'" *Winner v. State Farm Ins. Cos.*, No. 3:05-CV-143, 2006 WL 2792399, at *2 (W.D. Ky. 2006) (quoting *Matt v. Liberty Mut. Ins. Co.*, 798 F. Supp. 429, 434 (W.D. Ky. 1991), aff'd, 968 F.2d 1215 (6th Cir. 1992) (applying Kentucky law))); *see United Services*, 183 S.W.3d at 186 ("Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury."); *Motorists Mut. Ins.*, 996 S.W.2d at 452 (to survive a motion for summary judgment, "[t]here must be proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage"). This precedent persuades the Court that to survive this motion for summary judgment and proceed to trial, Plaintiffs must put forth sufficient evidence to support a reasonable inference that State Farm's behavior was so egregious that they are entitled to punitive damages. *See Wittmer*, 864 S.W.2d at 890; *United Services*, 183 S.W.3d at 186. Because Plaintiffs have not done so, State Farm is entitled to summary judgment on Plaintiffs' bad faith claim.

## 2. Outrageous Conduct Claim

In addition to their bad faith claim, Plaintiffs generally assert claims for the tort of outrage. To recover on the tort of outrage, Plaintiffs must show that State Farm intentionally or recklessly caused severe emotional distress to them by extreme and outrageous conduct. *Capital Holding Corp. v. Bailey*, 873 F.W.2d 187 (Ky. 1994). However, when an actor's conduct

amounts to the commission of a traditional tort for which recovery for emotional distress is allowed, then the tort of outrage will not lie.  *Bennett v. Malcomb*, 320 S.W.3d 136, 137 (Ky. App. 2010).  Because damages for mental anguish and distress are recoverable in an action for bad faith, *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1999), and because Plaintiffs' outrage claim stems from their bad faith claim, State Farm is entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, Defendant State Farm's motion for summary judgment (DN 35) is GRANTED.  An appropriate order will follow.